UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DINA SOTTILE, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 10-62 |
| v. | : | OPINION |
| CHURCH HEALTHCARE, LLC d/b/a INNOVA HEALTH & REHAB, | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's motion for summary judgment. Oral argument on the motion was heard on September 14, 2011, and the record of that proceeding is incorporated here. For the reasons expressed on the record, and those outlined below, Defendant's motion will be granted in part and denied in part.

**Background**

Plaintiff Dina Sottile is a former employee of Defendant Church Healthcare, LLC d/b/a Innova Health & Rehab. She brings claims against her former employer pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 ("FMLA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and the Pregnancy Discrimination Act Amendment, 42 U.S.C. § 2000e (k), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 ("ADA").

Plaintiff was hired in July of 1999 as a Social Worker at the Mount Laurel Nursing and Rehabilitation Center. She applied to work as a Social Worker for Defendant on January 1, 2003, having been referred by the Mount Laurel Nursing and Rehabilitation Center when that facility declared bankruptcy and Defendant took over its location via an asset sale. On or about February 1, 2003, Plaintiff was named Director of Social Services at Defendant's Mount Laurel facility.

On December 6, 2004, Defendant provided Plaintiff with a letter indicating that she was eligible for twelve weeks of unpaid FMLA leave effective from November 18, 2004 through February 18, 2005.  Plaintiff has testified that the leave occurred when she had first been diagnosed with Crohn's disease.  (Sottile Dep., p. 21.)

In or about August 2007, Plaintiff was offered a promotion to Assistant Administrator at the Defendant's Mount Laurel Facility.  (Sottile Dep., p. 24.)  She also served as Interim Administrator at the Defendant's Deptford facility for about four months, while Defendant searched for an Administrator for that location.  (Id., p. 29.) Plaintiff's Employee Performance Evaluation from February 1, 2006 to February 1, 2007 rated her as competent, at an acceptable level, sometimes exceeding expectations. (Murphy Decl., Ex. B; Myzal Dep., p. 20-21.)  Her supervisor has characterized her performance as "very good."  (Myzal Dep., p. 18.)

In or about May of 2008, Defendant decided to implement a reduction in force to effect cost savings.  (Myzal Aff., ¶ 8.)  On or about June 12, 2008, Defendant's Operations Manager, Marc Myzal,  asked Plaintiff to accept a temporary position at the Deptford facility, where she would be performing social work, but would have the title of Assistant Administrator "to save face, . . . being that months before, [Plaintiff] was [Deptford's] Administrator."  (Sottile Dep., p. 36; Myzal Dep., p. 46, 48.)  Her salary was to remain the same.  (Id., p. 37.)  Sottile has testified that Myzal represented to her that the temporary stint in Deptford would be followed by a transfer to the position of Administrator at Defendant's Hammonton facility.  (Id., p. 38.)  She acknowledges that there was no formal offer for the Hammonton position, but there were "discussions." (Id., p. 45.)  Myzal has confirmed that the two discussed Plaintiff being targeted to be

2

promoted to Administrator of Hammonton.  (Myzal Dep., p. 49, 56.)  Further, Myzal

testified that he did, in fact, offer Plaintiff the Administrator position at the Hammonton

facility.  (Myzal Dep., p. 98.)  Plaintiff was also informed at the time that the position of

Assistant Administrator in Mount Laurel was to be eliminated.  (Sottile Dep., p. 65;

Myzal Dep., p. 57, 102, 105.)  Myzal has testified, in addition, that at the time of his

discussions with Plaintiff regarding the temporary position in Deptford, Defendant was

not contemplating terminating Plaintiff's employment.  (Myzal Dep., p. 48, 103-04.)

Initially, it appeared to Myzal that Plaintiff was not interested in Defendant's

proposal because she did not want the position in Hammonton.  (Myzal Dep., p. 51, 83,

107-08.)[1]  On June 13, 2008, however, Plaintiff sent an e-mail to Myzal with the subject,

"Deptford," indicating that she would "accept the transfer as Assistant Administrator."

(Schlesinger Decl., Ex. M; Murphy Decl., Ex. E; Sottile Dep., p. 42-43.)  Myzal in turn e-

mailed Drew Barile, stating, "Dina Sottile has decided that she wants to be with us, and

will be at Deptford as of Monday AM to perform the social service functions until our

issue is resolved.  She and I will speak about Hammonton again later today, I did not

have the time to further that conversation this morning."  (Schlesinger Decl., Ex. N;

Murphy Decl., Ex. F.)

The same day, Drew Barile, Defendant's CEO, sent an e-mail to Myzal, Scott

Piotti, CFO, and Ron Singer, Director of Financial Operations, copying Lisa Kelly, a

marketing manager, and Michelle Meier of Human Resources.  He wrote, "Scott finalize

---

[1]To the contrary, Plaintiff testified that she expressed concern regarding the distance to Hammonton, but Myzal explained how close the facility was, and Plaintiff "absolutely" accepted the offer regarding Hammonton.  (Sottile Dep., p. 40-41, 46, 48-49.)

3

your RIF with Marc and get it to me.  We are accelerating this for next week.  I am finished talking.  The [follow] through from the leadership in this portfolio is horrible.  I will be adding some others once you are done.  I want it today." (Schlesinger Decl., Ex. X.)  Barile followed up with another e-mail on Wednesday, June 18, 2008: "1.  Add one assistant administrator - this is an immediate RIF.  2.  Replacing Gloria was and is not an option so remove it from the sheet.  3.  Where are Marc's reductions?  Nursing Managers at Deptford.  4.  400K is not enough, I want some higher paid people gone.  5. Where is the consolidation of the services plan?" (Schlesinger Decl., Ex. X.)  At the time, there was only one Assistant Administrator in all of Defendant's facilities – Plaintiff Dina Sottile.  (Myzal Dep., p. 62, 66-67; Barile Dep., p. 45-46.)

On Monday, June 16, 2008, Plaintiff informed Myzal that she would not be in work because she was not feeling well, and she would be heading to her doctor's office that afternoon.  (Schlesinger Decl., Ex. P; Murphy Decl., Ex. G.)  That evening, Plaintiff notified Myzal that she would be out of work for one week per her doctor's orders "due to recurrent colitis." (Id.)  On Wednesday, June 18, 2008, Plaintiff and Myzal exchanged e-mails; Myzal wanted to know how Plaintiff was feeling and whether there was any chance she could be at the Deptford facility prior to the next Monday.  Plaintiff stated that on her doctor's instructions, the earliest she would be back would be the next Wednesday.  (Murphy Decl., Ex. I.)  At that time, Plaintiff was almost three months pregnant, but had not yet informed anyone at work.  (Sottile Dep., p. 53.)

There are handwritten notes in the record, identified as having been taken by Meier, from "6/23 - RIF meeting."  Under "Mt. Laurel," there are three entries, "A. 1 unit mgr.;  B. Dolores;  C. Dina." (Schlesinger Decl., Ex. Y; Murphy Decl., Ex. U.)  On a page

4

captioned "6/24 - Regional," there is a notation, "Layoffs happening on Friday." (Id.)
Myzal has testified, "The organization was going through a reduction in force and one of
the line items for reduction in force was the elimination of the assistant administrator
position.  That position was – the plan was brought forth by me and some other
individuals who developed the plan and was agreed to by the organization." (Myzal
Dep., p. 12.)  Myzal has testified that as of June 24th, the decision was made to lay off
the Plaintiff, and the decision actually had been made June 18.  (Myzal Dep., p. 69-70.)

Myzal has submitted an affidavit in support of Defendant's summary judgment
motion, stating that Plaintiff was identified as an employee subject to the RIF at the
June 23, 2008 meeting.  (Myzal Aff., ¶ 34-35.)  The reasons were that (1) the position of
Assistant Administrator was being eliminated, and (2) "Plaintiff expressed discontent
with regard to holding the title Temporary Director of Social Services . . . because the
move constituted a demotion and made her feel uncomfortable." (Id., ¶ 36-39.)
Defendant's position is that Plaintiff rejected the promotion to Administrator at
Hammonton. "Had she accepted the Administrator title, she would have not been
terminated as part of the reduction in force." (Def.'s Response to Pl.'s Interrogs., #7.)

On Tuesday, June 24, 2008, Plaintiff e-mailed Myzal and Adriane Dumas,
Human Resources Director of Mount Laurel, "I had 2 follow up doctor appointments
this week.  I am not able to return to work to date.  I will be out of the office until at least
7/7/08.  I will be dropping off my paperwork on Thursday to Adriane.  Any questions let
me know." (Schlesinger Decl., Ex. R; Myzal Dep., p. 30.)  Myzal forwarded Plaintiff's e-
mail to Michelle Meier and Drew Barile with a note stating, "We need to discuss how I
handle this lay off." (Schlesinger Decl., Ex. S; Murphy Decl., Ex. J.)  Meier advised, "If

5

we are eliminating the position, fmla doesn't really come into play." (Schlesinger Decl., Ex. T.) Barile added, "FMA is not an issue, the rules are clear." (Id.)

On Wednesday, June 25, 2008 Myzal wrote to Plaintiff, asking whether she could meet him in Mount Laurel that Friday, June 27. (Schlesinger Decl., Ex. U; Murphy Decl., Ex. K.) Plaintiff replied, "No, I am not feeling well.  I will be having someone drop off my paperwork to work tomorrow.  You can always call me." (Id.)  Plaintiff's fiancé hand delivered her doctor's notes to Adriane Dumas the following day, June 26.  (Sottile Dep., p. 60.)  The record contains a doctor's note from Gastroenterologists Limited dated June 16, 2008 stating, "Dina Sottile was seen today.  I have advised her to remain out of work for 1 week because of recurrent colitis in association with pregnancy." (Schlesinger Decl., Ex. V; Murphy Decl., Ex. H.)  There is also a note from Cherry Hill Gynecology Associates, P.A. dated June 23, 2008.  It reads, "[Dina Sottile] has been advised to stop working effective 6/23/08 - 7/7/08 due to pregnancy complications." (Id.)  Plaintiff was not provided with  any documentation regarding her FMLA rights at that time.

Myzal called Plaintiff on Friday, June 27, 2008, and informed her that her position with the Defendant company was being terminated, that she no longer had a position with the company.  (Sottile Dep., p. 64-67; Myzal Dep., p. 82.)  Plaintiff received termination paperwork in the mail the next day.  (Id., p. 66.)  On June 27, 2008, Myzal e-mailed Barile, Piotti, Meier, and others, stating, "All planned RIF actions with the exception granted at Deptford[2] took place." (Schlesinger Decl., Ex. AA.)

---

[2] Myzal testified that he believed there was a female unit manager in Deptford who was not "put into the RIF." (Myzal Dep., p. 81.)  Barile confirmed Airen Trod, a

In describing the reduction in force, Scott Piotti recalled that three people[3] out of 600 of Defendant's employees were laid off for a savings of approximately $150,000 to $175,000. (Piotti Dep., p. 15-16.)[4]  In determining who to terminate, he decision-makers looked at "job responsibilities," "performance," "different departments and how they were performing," and "market strategy, positions, and where we were against other competitors." (Id., p. 16.)  Finally, Piotti has testified, "We had discussions probably in late May, early June regarding eliminating [the position of Assistant Administrator] as part of the overall savings, due to a number of factors.  One of which, in the marketplace there isn't that position, typically in these types of nursing homes.  Number 2, we've had assistant administrators in the past in other facilities, which we didn't have any longer.  However, given at the time the value of Dina Sottile's employment and the fact that we helped her get her LHNA, which is a Licensed Home Administrator's license, we came up with a different scenario that we would still eliminate this position because it's not a position that's in the marketplace and one we could have, and that we were going to offer her another position within the organization." (Piotti Dep., p. 21-22.)  To this end, Piotti believed Myzal offered Plaintiff the Administrator's position in Hammonton, as was discussed by Defendant's upper management. (Id., p. 22-23.)  Piotti understood

---

licensed social worker who was acting in the position of director of social workers in Deptford, was not released. (Barile Dep., p. 73.)

[3]Defendant's Responses to Interrogatories identified the three as (1) Plaintiff, (2) Ginger Ferrino, an administrative assistant, and (3) Dolores Jackson, a human resources assistant. (Murphy Decl., Ex. Q.)

[4]Ron Singer estimated that the June 2008 reduction in force comprised approximately a million dollars of layoffs. (Singer Dep., 12.)  He also testified that job performance was not considered in the decisions to cut staff. (Id., p. 13-14.)

from Barile's June 18th e-mail that Plaintiff did not accept the permanent position in Hammonton; therefore, Defendant went ahead with eliminating her Assistant Administrator position, resulting in her termination.  (Piotti Dep., p. 31-32.)

Plaintiff filed a claim for temporary disability benefits on June 30, 2008.  The claim, certified by Plaintiff's gynecologist, described Plaintiff's disability as "Crohn's Disease in pregnancy, Chronic Diarrhea." (Schlesinger Decl., Ex. W.)  In the section of the disability form completed by the employer, Dumas wrote on July 2, 2008, that Plaintiff was terminated because her position was eliminated.  (Id.)  Nonetheless, Plaintiff received temporary disability benefits up until after she gave birth on December 15, 2008.  (Sottile Dep., p. 68-69.)  Plaintiff then collected unemployment compensation from January until May of 2009.  (Sottile Dep., p. 70.)  In May of 2009, Plaintiff obtained employment as a clinical intake coordinator; she was still employed as of the date of her deposition, September 21, 2010.  (Sottile Dep., p. 72-73.)

Plaintiff filed a Charge of Discrimination with the EEOC in October, 2008.  After receiving a Notice of Right to Sue from the EEOC, Plaintiff brought suit in the United States District Court for the Eastern District of Pennsylvania, alleging that she was wrongfully terminated (1) without FMLA leave, (2) due to her pregnancy, (3) because of her gender, (4) in violation of the ADA, and (5) in violation of the New Jersey Law Against Discrimination (due to her pregnancy, gender, and disability).  The case was transferred to the District of New Jersey pursuant to 28 U.S.C. § 1404(a).

**Discussion**

**A.  Summary Judgment Standard**

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.;

9

<u>Maidenbaum v. Bally's Park Place, Inc.</u>, 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Andersen</u>, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

<u>Celotex</u>, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); <u>accord</u> Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

**B.     The Family and Medical Leave Act**

1.     <u>Generally</u>

The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, ("FMLA") was enacted to provide leave for workers whose personal or medical circumstances require

that they take time off from work in excess of what their employers are willing or able to provide.  Victorelli v. Shadyside Hosp., 128 F.3d 184, 186 (3d Cir. 1997) (citing 29 C.F.R. § 825.101). The Act is intended "to balance the demands of the workplace with the needs of families . . . by establishing a minimum labor standard for leave" that lets employees "take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse or parent who has a serious health condition." Churchill v. Star Enters., 183 F.3d 184, 192 (3d Cir. 1999) (quoting 29 U.S.C. § 2601(b)(1), (2)).

The FMLA guarantees eligible employees 12 weeks of leave in a one-year period following certain events: a serious medical condition; a family member's serious illness; the arrival of a new son or daughter; or certain exigencies arising out of a family member's service in the armed forces.  29 U.S.C. § 2612(a)(1). During the 12 week leave period, the employer must maintain the employee's group health coverage. § 2614(c)(1). Leave must be granted, when "medically necessary," on an intermittent or part-time basis. § 2612(b)(1). Upon the employee's timely return, the employer must reinstate the employee to his or her former position or an equivalent. § 2614(a)(1). The Act makes it unlawful  for an employer to "interfere with, restrain, or deny the exercise of" these rights, § 2615(a)(1); to discriminate against those who exercise their rights under the Act, § 2615(a)(2); and to retaliate against those who file charges, give information, or testify in any inquiry related to an assertion of rights under the Act, § 2615(b).  Violators are subject to payment of certain monetary damages and appropriate equitable relief, § 2617(a)(1). The Act provides for liquidated (double) damages where wages or benefits have been denied in violation of the Act, unless the defendant proves to the court that the violation was in good faith.

To evoke the requirement for unpaid FMLA leave, an eligible employee need not specifically assert his rights under the Act, or even mention the Act itself.  29 C.F.R. § 825.208(a)(2).  All that is required is that the employee state an FMLA qualified reason for the leave.  Id.  "[T]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'"  Holpp v. Integrated Commc'ns Corp., Civ. No. 03-3383, 2005 WL 3479682, at *5 (D.N.J. December 20, 2005) (quoting Brohm v. JH Props., 149 F.3d 517, 523 (6th Cir. 1998)) (emphasis added).  Moreover, 29 C.F.R. § 825.302(c) requires an employer to "inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken."  29 C.F.R. § 825.302(c) (2006).  "In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA qualifying, based on information provided by the employee."  Id. § 825.208(a). The designation generally must be made before the leave starts, but only in limited circumstances can leave be designated as FMLA-protected after it has ended, usually within two business days.  Id. § 825.208(e).

Pursuant to the FMLA and its implementing regulations, "when an employee provides notice of the need for FMLA leave, the employer shall provide the employee with notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations."  29 C.F.R. § 825.301(b)(1).  This notice should contain, for example, whether the leave counts against the FMLA entitlement, whether the employee is required to provide medical certification of a serious health condition and the consequences for failure to do so, any requirement

to provide a fitness for duty certificate upon restoration of employment, and the right to the same position at the end of the leave.  Id.  The employer should request certification, in most cases, prior to or immediately after leave commences, but may do so some time thereafter if there is reason to question the reason for the leave or its duration.  Id. § 825.305.

Although employers may adopt or retain leave policies more generous than any policies that comply with the requirements under the FMLA, 29 U.S.C. § 2653, the "rights established by the Act may not be diminished by any employment benefit program or plan," 29 C.F.R. § 825.700.

2.    Interference

An employer interferes with the exercise of an employee's right to unpaid leave if it fails to provide the employee who gives notice of the need for leave a written notice detailing the specific expectations and obligations of the employee and explaining any consequence of a failure to meet these obligations.  See 29 U.S.C. § 2615(a)(1); Parker v. Hahnemann University Hosp., 234 F. Supp. 2d 478, 483 (D.N.J. 2002).  Further, conduct discouraging employees from taking FMLA leave has been held to constitute interference, even if the employee ends up taking the leave.

3.    Retaliation

Pursuant to the FMLA, "[i]t [is] unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  It follows that the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2) (1993).

But where an employee is discharged during a protected leave for a reason unrelated to the leave, there is no right to reinstatement.  Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004) (citing 29 C.F.R. § 825.216(a)(1)).

In cases alleging retaliation in the employment setting, courts generally apply the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001).  The first step under McDonnell Douglas, is to establish a prima facie case of retaliation for requesting FMLA leave. 411 U.S. at 802.  To carry this initial burden in a retaliation case, a plaintiff must show that: (1) she engaged in protected activity (taking FMLA leave); (2) she suffered an adverse employment decision; and (3) the adverse decision was causally related to the leave.  Cognoscenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 146-47 (3d Cir. 2004).  A causal connection may be established by circumstantial evidence, such as temporal proximity, a pattern of antagonism, and pretext.  Kachmar v. SunGard Dadt Sys., 109 F.3d 173, 177 (3d Cir. 1997).  This indirect evidence is to "be considered with a careful eye to the specific facts and circumstances encountered."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279, n.5 (3d Cir. 2000).

Once a prima facie case is established, the burden of persuasion shifts back to the defendant to put forth "a legitimate, nondiscriminatory reason" for the employment decision. Id.; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  If the defendant succeeds in demonstrating that the decision was based on a non-discriminatory reason, Plaintiff has the burden of proving by a preponderance of the evidence that the stated reason was pretextual.  Burdine, at 260; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).

14

In evaluating employment cases, the task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose. <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 525-27 (3d Cir. 1992). Thus, to establish pretext, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the . . . plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employers's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer' did not act for [the asserted] nondiscriminatory reasons." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir.1994) (internal citations omitted); <u>Romano v. Brown & Williamson Tobacco Corp.</u>, 284 N.J. Super. 543, 551 (citing <u>Fuentes</u>, 32 F.3d at 764-65).

"[F]iring an employee for [making] a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." <u>Erdman v. Nationwide Ins. Co.</u>, 582 F.3d 500, 509 (3d Cir. 2009). On the other hand, an employer is not required to suspend its termination proceedings just because the employee requests medical leave. <u>See, e.g.</u>, <u>Clark County Sch. Dist.</u>, 532 U.S. at 272. "A contrary holding might impede employers from permissible terminations and encourage employees aware of an impending termination to attempt to create their own 'severance package.'" <u>Windfelder v. The May Dep't Stores Co.</u>, 93 Fed. Appx. 351, 355 (3d Cir. 2004).

4.    <u>Analysis</u>

Regarding the interference claim, the record reflects that upon learning that

Plaintiff would be out of work for a week upon the advice of her doctors, Defendant did

not inform Plaintiff of her FMLA rights or her eligibility for FMLA leave, nor did

Defendant provide Plaintiff with such leave.  Defendant has argued that at the time of

Plaintiff's layoff, there existed no position to which she would have been entitled had she

not taken leave.  This belies the fact that, although the Assistant Administrator position

was to be eliminated, Plaintiff certainly had accepted the offer to work in the Deptford

facility on a temporary basis.  Instead, when Plaintiff was terminated, Defendant turned

to Dana Elliott to take the position that Plaintiff was to fill.  Moreover, the record reflects

that there would have been a position for Plaintiff to return to after taking leave because,

although layoffs were contemplated, Defendant valued Plaintiff's employment, and had

invested in helping her to get requisite licensure to progress within the organization, and

had no plans to terminate her as of June 13, 2008.

Next, Defendant argues that it implemented Plaintiff's termination for reasons

unrelated to the exercise of her FMLA rights -- as part of a reduction in force, resulting in

a cost savings to Defendant of $60,000.  The record contains genuine issues of material

fact, however, that undermine Defendant's contention of a company RIF as a legitimate

reason to terminate Plaintiff.  A jury could conclude that the RIF is unworthy of credence

because so few employees were affected by the layoff, so the cost savings seems rather

insignificant.  Further, there are conflicts in the record as to the reason for eliminating

Plaintiff, not just the Assistant Administrator position.

As to the retaliation claim, Defendant argues that there is no causal connection

between Plaintiff's request for leave and Defendant's decision to implement her layoff. Defendant states that it did not act in an antagonistic manner in response to Plaintiff's request for leave.  The timing of Plaintiff's termination, however, is suspect, especially in light of the statements in the record that Defendant had no intention of letting Plaintiff go as of Friday, June 13, 2008, despite that the Assistant Administrator position was to be eliminated.  Defendant has acknowledged that it was on notice of Plaintiff's need for medical need the following Monday, June 16, 2008.  (Def. Br. p. 20.)  In addition, that Plaintiff took FMLA leave in December 2004 does not exonerate Defendant.  Rather, it informs the record that Defendant had prior notice of Plaintiff's medical condition.

Finally, Defendant argues that Plaintiff cannot prove that Defendant's stated reasons for terminating Plaintiff were pretextual.  As discussed above, however, genuine issues of fact remain as to whether the RIF was a pretext for discrimination.  Further, there are contradictions in the record regarding Defendant's recently articulated reason for Plaintiff's termination being her reluctance to accept the temporary position in Deptford.[5]  Accordingly, summary judgment will be denied on Plaintiff's FMLA claim.

## C.    The ADA and NJLAD

The Americans with Disabilities Act prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of

---

[5]Defendant also argues that the FMLA claim is of no consequence because, as it turned out, Plaintiff was on disability leave for approximately 7 months, whereas the FMLA would only have required Defendant to hold Plaintiff's position, or an equivalent position, for 12 weeks.  If of any effect at all, this argument may go to the issue of damages, but it has no bearing on whether Plaintiff's FMLA rights were violated.

employees, employee compensation,  job training, and other terms, conditions, and privileges of employment." See 42 U.S.C. § 12112(a).  Courts utilize the burden-shifting framework articulated in McDonnell Douglas, 411 U.S. 792, and Burdine, 450 U.S. 248, to evaluate claims under the ADA.  See Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995).

Pursuant to McDonnell Douglas, a plaintiff must first establish by a preponderance of the evidence a prima facie claim of discriminatory discharge.  She can do so under the ADA by demonstrating that "(1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination." Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir.1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir.1996)).

Analysis of claims made pursuant to the NJLAD generally follow the analysis of Title VII claims.  Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999).  Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  The NJLAD provides that "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment" is prohibited.  N.J. Stat. Ann. § 10:5-4.1.  Both actual and perceived

18

disabilities, or handicaps, are included.  Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 255 (3d Cir. 2006).  The framework announced in McDonnell Douglas, 411 U.S. 792, governs Title VII claims, and, by extension, claims under the NJLAD.

Under the McDonnell Douglas paradigm, a plaintiff must first establish by a preponderance of the evidence a prima facie claim of discriminatory discharge under the NJLAD by showing that (1) she belongs to a protected class (or is perceived as belonging to that class)[6]; (2) she was performing the job at a level that met the employer's legitimate expectations; (3) she was subjected to an adverse employment action; and (4) she was replaced or the employer sought another to fill the position.  Zive v. Stanley Roberts, Inc., 867 A.2d 1133 (N.J. 2005) (citing Clowes v. Terminix Int'l, Inc., 538 A.2d 794 (1988)).

Once a prima facie case has been made under the ADA or NJLAD, the burden of production shifts to the employer to produce evidence demonstrating that the termination was "for a legitimate, nondiscriminatory reason."  Burdine, 450 U.S. at 254. Again, if the defendant meets this burden, the presumption of discrimination drops from the case, and the burden shifts to the plaintiff to prove by a preponderance of the

---

[6]To state a claim for perceived handicap discrimination, a plaintiff must identify facts which demonstrate that her employer perceived her as being handicapped. Andersen, 89 N.J. at 493, 446 A.2d 486; see also, Olson v. General Electric Astrospace, 966 F. Supp. 312, 316 (D.N.J.1997) (The NJLAD protects individuals who are not disabled as defined by the statute but are perceived as being handicapped by their employers.)  "The question of whether a Plaintiff is regarded as having such an impairment . . . ordinarily is not one to be decided on summary judgment, as it involves a determination of state of mind that is more appropriate for the jury than for the judge."  Bowers v. National Collegiate Athletic Ass'n, 563 F.Supp.2d 508, 532, n.18 (D.N.J. 2008) (quoting Mues v. General Revenue Corp., No. 1:05-CV-00505, 2007 WL 2248165, *7 (S.D.Ohio Aug.2, 2007)).

evidence that the stated reason was pretextual.  Id. at 260; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).

Defendant has argued that it was never advised that Plaintiff needed time off due to Crohn's disease.  Thus, Defendant asserts that because recurrent colitis should not be considered a disability or handicap, it could not have used that condition as a basis for discrimination.  In addition, Defendant argues that Plaintiff is not a qualified person with a disability,[7] since she could not have performed her essential job functions, even with a reasonable accommodation, as was evidenced by her application for and receipt of disability benefits.

Again, the fact that Plaintiff took FMLA leave in December 2004 for Crohn's disease informs the record that Defendant had prior notice of Plaintiff's medical condition.  In addition, as Plaintiff has pointed out:

---

[7]The ADA defines a qualified individual with a disability to be "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  It defines a disability to be one of three things: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).  In turn, "major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I).

The NJLAD defines a "handicapped" person as one suffering from a "physical disability . . . or from any mental, psychological, or developmental disability . . . which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." N.J. Stat. Ann. § 10:5-5(q).  Unlike the ADA's definition, the NJLAD's definition of  "handicapped" is very broad in its scope and the New Jersey Supreme Court directs that the Act be construed liberally.  Clowes, 538 A.2d 794.  However, the NJLAD does not define the specific conditions that fall within its purview.  Id.

Many courts have recognized that relapsing-remitting conditions like multiple sclerosis, epilepsy, or colitis can constitute ADA disabilities depending on the nature of each individual case. See, e.g., Cehrs v. Ne. Ohio Alzheimer's Research Ctr., 155 F.3d 775, 780 (6th Cir. 1998) (finding that plaintiff who suffered flare-ups of pustular psoriasis eight years apart was disabled under the ADA because "[i]t is not necessary that she experience flare-ups on a daily basis . . . [plaintiff's] case of psoriasis is a physical impairment because of the ongoing nature of the disease and its physiological impact even during its dormant stage"); Zande v. State of Wis. Dep't of Admin., 44 F.3d 538, 544 (7th Cir. 1995) ("[A]n intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate.*619 Often the disabling aspect of a disability is, precisely, an intermittent manifestation of the disability, rather than the underlying impairment."); cf. Ryan v. Grae & Rybicki, 135 F.3d 867, 871-72 (2d Cir. 1998) (noting that because the determination of whether an impairment substantially limits a major life activity within the meaning of ADA is fact-specific, a court of appeals' decision that a particular employee's colitis did not present a prima facie case of a substantial limitation on her ability to care for herself did not mean that colitis could never impose such a limitation under the specific facts of other cases).

E.E.O.C. v. Chevron Phillips Chemical Co., 570 F.3d 606, 618-19 (5th Cir. 2009).

Regarding Plaintiff's ability to perform the essential functions of her position with reasonable accommodation, the record reflects that when Plaintiff was accommodated by being granted a short leave in 2004, she returned to work without incident and fully functional.  Under these circumstances, and considering the conflicts in the record that raise questions of credibility, summary judgment on the disability discrimination claims will be denied.

**D.    Discrimination based on gender and pregnancy**

There is no evidence in the record that would tend to indicate that Defendant took any action regarding Plaintiff due to her gender.  Further, the record is clear that Defendant did not know about Plaintiff's pregnancy until June 26, 2008, by which date Defendant had already taken steps to communicate Plaintiff's termination to her.

Therefore, regardless of whether brought under Title VII or the NJLAD, any claim that Defendant discriminated against Plaintiff based on her gender and/or her pregnancy cannot survive summary judgment.

## Conclusion

For these reasons, as well as those articulated on the record September 14, 2011, summary judgment is denied on Plaintiff's FMLA claim and on her claims of disability discrimination, but summary judgment is granted as to any claim that Defendant discriminated against Plaintiff based on her gender and/or her pregnancy.

An appropriate Order will be entered.


                                                    /s/ Joseph H. Rodriguez
Dated: September 28, 2011                          JOSEPH H. RODRIGUEZ
                                                           U.S.D.J.


22